**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DAVID J. B., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 17 CV 6162 |
| | ) | |
| NANCY BERRYHILL, | ) | Judge Thomas M. Durkin |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

David J. B. ("Claimant") brings this action pursuant to 42 U.S.C. §§ 405(g) for judicial review of the final decision of the Commissioner of Social Security denying Claimant's claim for disability insurance benefits. The parties filed cross motions for summary judgment. Dkt. 15; Dkt. 19. For the following reasons, the Commissioner's motion is denied, and Claimant's motion is granted.

## Background[1]

Claimant is 49 years old, has a twelfth-grade education and lives with his wife and two young children. R. at 38-39, 194. From 1998 to 2004, Claimant worked for Crofton Diving Corporation as a commercial deep-sea diver servicing the Navy fleet and constructing and rehabilitating piers. In that role, he lifted a maximum of approximately 100 pounds underwater, including the weight of his underwater suiting. *Id.* at 39, 40, 225. From 2004 to 2006, Claimant worked sporadically as a

---

[1] References to the Administrative Record (Dkt. 9) are cited as R. #.

commercial diver for Lindhal Marine Contractors Inc., and was required to lift about the same amount of weight. *Id.* at 41-42, 178-79, 225. Although Claimant is not a licensed plumber, Claimant worked for Roto Rooter Services Company from 2005 to 2009 doing light plumbing and drain cleaning. He regularly wheeled approximately 250 to 300 pounds of equipment up and down stairs on a cart. Claimant suffered a back injury in 2009 as a result. *Id.* at 43, 44, 179, 225. He subsequently had back fusion surgery, and has not returned to work since. *Id.* at 20, 44, 172, 234.

## I.      **Procedural History**

In August 2014, Claimant filed an application for disability insurance benefits alleging disability since May 2009 due to back injury, nerve damage, and extreme muscle and joint pain. *Id.* at 92, 172, 201. Claimant's claim was denied on December 30, 2014, and again upon administrative reconsideration on February 27, 2015. *Id.* at 92, 101. Claimant filed a timely request for a hearing before an Administrative Law Judge (ALJ). *Id.* at 107. The hearing was held on June 13, 2016. *Id.* at 33. In his Pre-Hearing Memorandum, Claimant alleged that he suffered from congenital myopathy,[2] spinal stenosis, and depression and anxiety, and that his impairments were medically determinable and severe. *Id.* at 235. On July 22, 2016, the ALJ upheld the decision to deny benefits. *Id.* at 15. The Appeals Council denied review, making the ALJ's decision the Commissioner's final decision for purposes of judicial review. *Id.* at 1. Claimant filed suit on March 7, 2018 pursuant to 42 U.S.C. § 405(g) for review

---

[2] Congenital myopathies are rare muscle diseases present at birth resulting from genetic defect.

of the Commissioner's decision. Dkt. 1. Claimant last met the insured status requirements on March 31, 2014. R. 194. Thus, to qualify for benefits, Claimant's disability must be established on or before that date. 20 C.F.R. § 404.131.

## II.   Medical and Other Evidence

The record includes evidence of Claimant's treatment with: (1) Dr. Patrick Sweeney, an orthopedic surgeon with Minimally Invasive Spine Specialists who performed Claimant's back surgery in June 2009 and supervised his physical therapy and work conditioning thereafter; (2) primary care physician Dr. Neilesh Shah of Advocate Medical Group—Orland Park; (3) rheumatologist Dr. John Sunil of Advocate Medical Group, with whom Claimant consulted in December 2013 and again in January 2014; (4) neurologist Dr. Michael Sergeant of Plaza Tower Neurology, with whom Claimant consulted in May and July 2014; and (5) Dr. Alyce Jackson of Riverside Healthcare, who specializes in physical medicine and rehabilitation and with whom Claimant consulted in May 2015. In addition to his treatment, Claimant received two functional capacity evaluations in May 2010. Claimant's medical records were also reviewed in connection with his disability claim by Agency medical consultants in late 2014 and early 2015, and by Dr. Julian Freeman—a neurologist and internist hired by Claimant—in June 2016. The Court addresses the evidence chronologically below.

### A.  2009 – 2010

In January 2009, Claimant underwent magnetic resonance imaging (MRI) of his lumbar spine due to left lower extremity pain and two years of chronic back pain.

R. 501-02. The MRI revealed a large left paracentral disc herniation at L5/S1 and a diffuse disk bulge at L4/L5 with a "superimposed annular tear causing severe narrowing of the neural foramina."[3] R. 500. Later that month, Claimant underwent a physical therapy evaluation at Dr. Sweeney's office. *Id.* at 433. Claimant complained of low back pain and left leg pain and weakness. According to Claimant, rest helped to alleviate his symptoms, but the pain never completely ceased. *Id.* Claimant's therapist noted that his signs and symptoms were consistent with degenerative disk disease and a lumbar spine herniated nucleus pulposus (a condition in which all or part of the soft central portion of an intervertebral disk is forced through a weakened part of the disk), and ordered a course of physical therapy. *Id.* at 433-34. Dr. Sweeney also attempted to relieve Claimant's symptoms with epidural injections. Neither brought relief, so Dr. Sweeney performed lumbar fusion surgery in June 2009. *Id.* at 377, 448-50, 501-02.

Ten days after surgery, Dr. Sweeney noted that Claimant was doing well and that his x-rays were satisfactory, and although Claimant reported some lower extremity pain and numbness, his pain was only a 2 out of 10, and was relieved with Neurontin, a brand name for the generic drug gabapentin, which is used to treat seizures and relieve nerve pain. *Id.* at 371. A month later, Claimant began physical therapy supervised by Dr. Sweeney and certified physician assistant Raymond Hines of the same office. At that time, Claimant had no leg pain, but was still limited by back pain and numbness in his left lower leg and burning in his left foot. *Id.* at 430-

---

[3] Neural foramina are openings of the sides of the spinal canal where nerve roots exit.

31. At a follow-up appointment in August 2009, Dr. Sweeney noted that Claimant's left foot numbness and tingling continued and that he experienced intermittent pain ranging from a 5 or 6 out of 10. *Id.* at 362. Dr. Sweeney recommended that Claimant take gabapentin as needed, but also noted that Claimant's x-rays "show[ed] excellent position with early, bony consolidation," and that Claimant scored 5 out of 5 on muscle testing, ambulated without assistance, and was able to walk heel to toe. Claimant reported that physical therapy had been "very beneficial." *Id.*

Claimant's symptoms improved, and by September 2009, his foot complaints had "almost completely resolved." Claimant was "extremely pleased" with his progress. *Id.* at 360. Dr. Sweeney returned Claimant to work with the following restrictions: no lifting, pushing or pulling over ten pounds; no bending below knee height; twisting and stretching only occasionally; and only sedentary work. *Id.* Dr. Sweeney recommended that Claimant continue to take gabapentin as needed. *Id.*

Claimant did not return to work, but by October 2009 was able to run 50 yards without low back pain and had returned to school. *Id.* at 292, 517. He began a work reconditioning program that December. His therapists described him as "an extremely hard worker" who was "very motivated to return to work." *Id.* at 268. By February 2010, Claimant had met all of his physical therapy goals and no longer required medication. *Id.* at 346. Accordingly, Dr. Sweeney concluded that Claimant had reached maximum medical improvement, and reduced Claimant's work restrictions to no lifting, pulling or pushing over 40 pounds, occasional twisting,

stretching and bending below knee height, and changing positions as needed. Dr. Sweeney described the restrictions as "permanent." *Id.*

Claimant underwent two functional capacity evaluations (FCE) three months later in connection with his workers' compensation claim. *Id.* at 337, 390. Claimant was classified into the medium work category, and assessed as able to lift 50 pounds from floor to waist and from waist to shoulder, and 46 pounds overhead. He could frequently lift 32 pounds from floor to waist level, 35 pounds from waist to shoulder, and 30 pounds overhead, and could carry 50 pounds, and carry 5 pounds frequently. *Id.* at 390. Claimant demonstrated the ability to stand, walk, forward reach, overhead reach, floor reach, crouch, simple/firm grasp, and fine motor grasp on a constant basis, and to frequently sit, climb steps, climb ladders, kneel and stoop. *Id.*

Thereafter, Dr. Sweeney updated Claimant's permanent work restrictions to no lifting over 50 pounds and no routine lifting greater than 25 pounds, and then further refined his restrictions to no lifting, pushing or pulling over 50 pounds, no repetitive lifting over 30 pounds, occasional twisting, stretching and bending below knee height, and changing positions as needed. Dr. Sweeney concluded—consistent with the FCE—that Claimant could perform in the medium work category, and noted that Claimant was not taking medication for his pain. *Id.* at 335, 337, 390.

But that same month, Claimant complained to primary care physician Dr. Shah about chronic fatigue and inability to concentrate. Dr. Shah noted Claimant's history of hyperlipidemia (increased levels of lipids or fat proteins in the blood),

elevated CK levels[4] and significant myalgias (muscle pain). He started Claimant on Adderall—a medication used to treat attention deficit hyperactivity disorder—to aid with concentration at school. He also ordered laboratory tests to assess Claimant's hyperlipidemia. *Id.* at 533. The tests were normal. *Id.* at 542. Claimant continued to report some lower back pain, but Dr. Sweeney concluded "there is little more for us to do." *Id.* at 335, 337, 342, 351, 353.

## B. 2012 – 2015

The next relevant evidence of Claimant's treatment occurred in November 2012, when Claimant reported to Dr. Shah that he was exercising regularly and "doing well," but had joint pain in his wrist and elbow. *Id.* at 474. According to Claimant, this pain had been occurring for a year and had grown worse. *Id.* Dr. Shah ordered x-rays which were normal, but Claimant's blood results revealed an elevated CK level. *Id.* at 573, 574. Accordingly, Dr. Shah advised Claimant to stop taking his Lipitor prescription, a lipid-lowering statin medication. *Id.* at 574. He did not impose work restrictions.

A year later in November 2013, Claimant's CK levels were still elevated despite that he had ceased taking his Lipitor prescription as directed. *Id.* at 467. Although Claimant reported that he continued to exercise regularly, he also complained of

---

[4] "CK" apparently stands for creatine kinase, an enzyme also known as creatine phosphokinase, or "CPK." A CK or CPK level may be elevated in health or disease; while exercise is the most common cause of a high level, a high level also can be a sign of damage to CK-rich tissue, such as in myositis (among others). A CK or CPK level also may be elevated due to the use of statin, or lipid-lowering, medications. *See* https://en.wikipedia.org/wiki/Creatine_kinase.

"achy pain throughout his body," and pain in his shoulders, knees and elbows, specifically. *Id.* Dr. Shah diagnosed Claimant with myalgia and myositis (inflammation of the muscles) and referred him to a rheumatologist. *Id.* at 467, 469-70.

At his initial rheumatology appointment with Dr. Sunil in December 2013, Claimant reported sporadic pain in his hands, right shoulder and left elbow. He reported that he could walk for three miles without pain, but experienced pain in his lower extremities when climbing stairs. *Id.* at 480. Claimant scored 5/5 in muscle strength in all muscle groups, had no atrophy or fasciculations (muscle twitches), and a normal gait. *Id.* at 482. Dr. Sunil nevertheless diagnosed Claimant with Raynaud's disease (a condition causing pain in the extremities in response to cold temperatures or stress), myalgia and mitosis, fatigue, and muscle spasms and weakness. He noted slightly decreased range of motion with tenderness in Claimant's right shoulder, and mild contracture deformity (shortening of tissues due to loss of elasticity) in his left elbow without tenderness. *Id.* at 482. Dr. Sunil found that Claimant's CPK levels were only "mildly elevated" and "not concerning," but ordered additional bloodwork and an Electromyography (EMG) to "rule out a myopathic process." *Id.* at 483. The EMG results were normal, indicating (among other things) that Claimant had full strength throughout both upper and lower extremities, and no evidence of myopathy or peripheral nerve damage. *Id.* at 484.

At his January 2014 follow-up appointment with Dr. Sunil (the last of record), Claimant again reported muscle pain, weakness and cramps, as well as "random

pain" in his hands, right shoulder and left elbow. *Id.* at 585. Claimant's physical examination was largely the same as the first. *Id.* at 482, 586. The EMG results caused Dr. Sunil to rule out inflammatory myopathy and doubt metabolic myopathy.[5] He advised Claimant to take NSAIDS for pain, and recommended an evaluation for depression and a follow-up appointment in 6 months. *Id.* at 588. He felt a muscle biopsy was unnecessary, and did not impose work restrictions. *Id.*

But Claimant continued to complain of muscle pain and weakness. In May 2014, Claimant reported foot pain and numbness to neurologist Dr. Sergeant. Dr. Sergeant believed Claimant had "muscle disease either a myopathy or type of muscle dystrophy perhaps a recessive form," noting that Claimant's cousin had muscular dystrophy. *Id.* at 591. He ordered a muscle biopsy for diagnosis, reasoning that "all [Claimant's] muscle tests have been abnormal with elevated cpk and myoglobin" despite stopping his cholesterol medication, and "[i]f he had statin induced myopathy only it would have improved by now." *Id.* at 625.

But that June (almost three months after Claimant's March 31, 2014 date last insured), Claimant's CK levels were normal. And the results of his July 2014 muscle biopsy were only "mildly abnormal," revealing no tissue death, a "modest" "type grouping," and no evidence of ongoing denervation (loss of nerve supply). *Id.* at 601, 606, 611. Claimant continued to exercise regularly, but reported increasing weakness

---

[5] Inflammatory myopathies are a group of diseases of unknown cause involving chronic muscle inflammation and weakness. Metabolic myopathies are a group of muscle diseases that affect metabolism and may cause exercise intolerance and muscle fatigue and cramping (among other symptoms).

in his legs, and that he "felt better resting." *Id.* at 601. Dr. Sergeant found evidence in his muscle biopsy of a "possibly congenital" "recovering myopathy" or a "subtle" "post infectious neuropathy" from which he was recovering. *Id.* at 610. He noted that Claimant was "still suffering from back surgery issues," and recommended "symptomatic treatment" of gabapentin and Zanaflex—a medication used to treat muscle spasms—for Claimant's cramping and restless legs. He suggested that Claimant may be exercise intolerant and that he avoid heat and extreme cold, stretch before and after exercise, drink Gatorade on hot days, and eat bananas for sodium and potassium. *Id.* at 607, 610. He did not impose work restrictions, but recommended that he see Claimant every 6 months. *Id.* at 610. There is no record evidence of further treatment by Dr. Sergeant.

Agency medical consultants reviewed Claimant's medical records in connection with his disability claim in December 2014 and again on reconsideration in February 2015, in each case concluding that Claimant was capable of performing light level work. *Id.* at 70-79, 80-90. Consultative examinations were not ordered. *Id.* at 72, 83. Ultimately, the Agency medical consultants concluded that Claimant: could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds; could stand and/or walk for about 6 hours in an 8-hour work day; could sit for a total of 6 hours in an 8-hour work day; was unlimited in his ability to push and/or pull other than as limited for lifting and carrying; could occasionally climb ramps, stairs, ladders, ropes and scaffolding; could occasionally balance, stoop, crouch and crawl; and could frequently kneel. *Id.* at 86-90. The consultants determined that Claimant

had no manipulative, visual or communicative limitations, and no environmental limitations other than to avoid concentrated exposure to extreme cold, vibration, unprotected heights and dangerous machines. *Id.* at 87-88.

Then, during a January 2015 appointment with Dr. Shah, Claimant reported that he was still exercising regularly, but had "ongoing myalgias" and increasing leg weakness. *Id.* at 611, 613. Dr. Shah noted that Claimant's muscle biopsy "was essentially negative," and "showed old denervation but no active disease process." *Id.* at 611, 643. He advised Claimant to see rheumatology, and noted that Claimant had ceased taking gabapentin, despite that it helped his symptoms. *Id.* at 613. Claimant's CK levels remained normal. *Id.* at 614. Claimant apparently did not return to rheumatology.

But Claimant saw physical medicine and rehabilitation specialist Dr. Jackson in May 2015, again reporting weakness, cramping, spasms and pain with increased activity, "severe pain followed by weakness" in his hands, and "fatigue and exhaustion" with simple tasks. *Id.* at 677. His physical examination was once again largely normal, with mildly abnormal muscle tone in the upper and lower extremities, but muscle strength at 5/5. *Id.* at 679. Dr. Jackson ordered a cervical spine MRI and water therapy for 6-8 weeks. She did not impose work restrictions. *Id.* Claimant's MRI revealed no acute cervical spine fracture, but showed mild arthritis and

"uncovertebral hypertrophy and facet disease leading to multilevel foraminal stenosis."[6] *Id.* at 622. There is no record evidence of further treatment by Dr. Jackson.

At his annual physical in September 2015, Claimant again reported worsening fatigue and muscle weakness in his arms and legs—particularly with activity—and stiff legs and joints. *Id.* at 634. Except for a low testosterone level, his laboratory tests were normal, and so was his physical examination. *Id.* at 634, 656. Claimant declined to follow-up with his rheumatologist, but was restarted on Adderall to assist with fatigue, and advised to continue gabapentin, take Cymbalta—a brand name antidepressant—for myalgias, and "lose weight and exercise." *Id.* at 637, 656.

### C. 2016

The last piece of record evidence is a 6-page June 11, 2016 report by Dr. Freeman prepared at Claimant's request. *Id.* at 685-92. The report—which is based on a review of Claimant's medical records—diagnoses Claimant with spinal stenosis and congenital myopathy "complicated by radiculoneuropathy,"[7] and concludes that Claimant's condition met Social Security regulation listing 11.13 (muscular dystrophy) or 11.17 (degenerative disease not listed elsewhere) since "at least" Claimant's May 1, 2009 alleged onset date. *Id.* at 681, 685, 687-88. According to Dr. Freeman, as of that date, Claimant was limited to: rarely lifting 30 pounds and very rarely lifting 50 pounds; no "frequent or occasional lifting, carrying, pushing or

---

[6] "Uncovertebral hypertrophy" refers to degeneration and enlargement of joints in the cervical spine. "Foraminal stenosis" is the narrowing of cervical disc space caused by the enlargement of a spinal joint.

[7] "Radiculoneuropathy" refers to a disease of spinal nerves and nerve roots.

pulling on a sustained basis"; walking and standing for only five minutes at a time and up to a total of 1 to 1.5 hours per day; sitting for 4 to 5 hours per day; and only occasionally bending, stooping and crouching. *Id.* at 690. Dr. Freeman also concluded that Claimant was unable to engage in sustained or repetitive grasping or use of his hands. Dr. Freeman opined that Claimant's ability to walk, stand, lift, carry and use his hands and fingers had since declined and would continue to decline. *Id.*

Dr. Freeman also determined that Claimant's "negative biopsy and EMG noted, the pattern noted in the CPK elevations, the age of onset [and] characteristic symptoms" nevertheless placed the congenital myopathy diagnosis "at over 80%." *Id.* at 687. And Dr. Freeman concluded that Claimant's muscle biopsy revealed a "chronic polyradiculoneuropathy" diagnosis of over 85% certainty.[8] *Id.* Dr. Freeman questioned the reliability of medical tests resulting in conclusions inconsistent with his own, taking issue with Claimant's FCEs in particular. According to Dr. Freeman, the FCEs did not include standard diagnostic and functional tests typically used for individuals with congenital myopathy. *Id.* at 688-89, 690-92. Dr. Freeman also discounted Claimant's clinical examinations, noting that they "do not identify weakness or fatigue of function and strength," "test repetitive activity" or "quantitate the force or strength of muscle activity," and are "inconsistent medically . . . with the CPK and myoglobin elevations, the underlying diagnosis of muscle pathology, and the severity of abnormality and residual spinal stenosis." *Id.* at 689. Ultimately, Dr.

---

[8] This is a rare disorder characterized by gradually increasing sensory loss and weakness with loss of reflexes.

Freeman concluded that the findings indicating no motor dysfunction were "of low reliability," and were "overridden by highly reliable findings" predicting "significant motor loss." *Id.* at 689.

### III. Hearing Testimony

#### A. Claimant's Testimony

At the hearing, Claimant described his employment as a commercial diver and his plumbing work for Roto Rooter, and explained his 2009 back injury. R. at 39-44. Claimant stated that he had back fusion surgery later that year. *Id.* at 44. He testified that despite his surgery, he has continued to have nerve problems in his left leg and foot. *Id.* He described the pain as "pins and needles" and "itching and burning," and testified that his whole foot became affected beginning in 2012. *Id.* According to Claimant, his foot pain is a constant four or five out of ten, and while he gets some relief when he stretches his foot, that relief is transient. *Id.* at 45. Claimant also stated that his feet sometimes drag uncontrollably on short walks of three or four blocks, and his foot is constantly numb. *Id.* at 46, 48, 55.

Claimant also complained of fatigue starting in 2011. According to Claimant, he was able to "do a couple ball handling drill kind of things" and "shoot baskets and free-throws" in his driveway that summer. But he became more fatigued that winter, and the following summer was no longer able to perform his basketball exercises. *Id.* Claimant explained that the fatigue has progressed, and that he becomes exhausted after ten minutes of activity and even has to rest after going up a flight of stairs. *Id.*

at 45, 53. Claimant explained that four or five times a week since 2013 he feels lightheaded as well, and needs to lay down for 30 to 45 minutes. *Id.* at 46.

Claimant also reported cramping in his hands, arms and legs. He recounted an experience in 2013 when his hands cramped up after about five minutes of painting his son's playhouse, and said that the problem has only grown worse with time. According to Claimant, because of the cramping, he switches hands when shaving. *Id.* at 54. Claimant stated that while he can lift 20 to 30 pounds without back pain, his arms cramp in the flexed position, even if he is not carrying anything. *Id.* at 48, 56. Claimant indicated that self-massage relieves his bicep cramps. *Id.* at 57. Claimant also testified that he would have trouble sitting at a desk because of leg cramping. *Id.* at 57-58.

Claimant explained that he sees his family physician regularly but had a hard time finding other doctors because of an insurance change, although he was able to visit a neurologist (Dr. Sergeant) who recommended that he not overexert himself and avoid extreme temperatures, and a rheumatologist (Dr. Sunil), but that his EMG was negative and he could not remember what else Dr. Sunil said. Claimant also indicated that he saw Dr. Jackson in the past year who he believed was a "physical therapy physician," and that while she sent him for "some sort of rehab" in a pool, his insurance would not cover it. *Id.* at 49. Claimant stated that "none of [the doctors] have really given me any kind of specific concrete answers as to what is wrong with me." *Id.* at 46-48. Other than his medications—which include gabapentin and Zanaflex (a muscle relaxer)—he has no treatment. *Id.* at 49. Claimant indicated that

he is unable to take his medications during the day because they make him sleepy. *Id.*

Claimant explained that his brother-in-law moved in with him and his wife in December 2012, and that his brother-in-law routinely helps with grocery shopping, laundry, his two young children, and picking up Claimant's wife after work. But Claimant is also able to drive short distances, change diapers, do laundry, play catch with his older son, make meals, and do some grocery shopping (among other things). *Id.* at 38-39, 50-51. When asked why he had waited so long to apply for benefits, Claimant stated that he had been focused on improving, but decided to pursue a claim when his symptoms continued to progress. *Id.* at 46.

### B.    Claimant's Wife's Testimony

Claimant's wife, Judy, also testified at the hearing. She reported that Claimant had issues with fatigue beginning in 2010 when their first son was born, and that his fatigue and foot pain have become progressively worse with time. *Id.* at 61. She explained that Claimant sometimes naps for an hour or two because of fatigue, and that her brother and she provide extra help with household chores and the children because of it. *Id.* at 61-62.

### C.    Vocational Expert Testimony

Vocational expert Sara Elizabeth Gibson was the last to testify. The ALJ asked her to consider a hypothetical individual with Claimant's background who was capable of performing light level work, where the individual: had limited use of hand controls bilaterally to frequently as opposed to constantly, as well as handling and

fingering frequently as opposed to constantly; may only climb ramps and stairs occasionally; could never climb ladders, ropes, or scaffolding; could balance, stoop, kneel and crawl occasionally; but could not have any exposure to unprotected heights, moving mechanical parts or concentrated exposure to vibrations. *Id.* at 63. Gibson responded that such an individual could perform the job of packer (estimating over 600,000 jobs in the nation), cashier (estimating over 1 million jobs in the nation), and assembler (estimating over 200,000 jobs in the nation). *Id.* at 64.

The ALJ then reduced the exertional level of the hypothetical individual to the sedentary level with the same limitations. *Id.* Gibson responded that such an individual could perform the job of packer (estimating over 400,000 jobs in the nation), assembler (estimating over 200,000 jobs in the nation), and inspector (estimating over 9,000 jobs in the nation). The ALJ then asked if either of the two hypothetical individuals would be able to retain employment if he or she were absent from work two days a month on average (defining absent as leaving early or not going to work at all). *Id.* at 65. Gibson stated that such an individual would not be capable of sustaining competitive employment over time. *Id.*

Claimant's attorney concluded the hearing by asking Gibson if the hypothetical individual would be able to retain employment if he or she missed 15 percent of the day, one day per week. *Id.* at 66. Gibson testified that under the common place "three strike" policy used by many employers, that individual would not be able to maintain employment, and nor would he or she if limited to only occasional handling or occasional reaching in front. *Id.* 66-67.

### D. The ALJ's Decision

The ALJ determined that Claimant has severe impairments of degenerative disc disease of the lumbar spine, arthritis, and myelopathy. *Id.* at 20. After concluding that Claimant's impairments did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526), the ALJ discussed the medical evidence (including treatment notes, blood tests, imagery, and physical examinations) and opinions. The ALJ gave "little weight" to treating physician Dr. Sweeney's opinion due to Claimant's hearing testimony that his fatigue, weakness and numbness intensified in 2011 and 2012—after his treatment with Dr. Sweeney had ended. The ALJ also gave "little weight" to Dr. Freeman's assessment of Claimant's RFC both because his opinion came more than two years after Claimant's date last insured, and because he determined that it was inconsistent with the evidence of Claimant's functioning during the relevant period. *Id.* at 22-25. The ALJ afforded "some weight" to Claimant's wife's testimony, to the extent that it showed that Claimant "experienced some fatigue" which may affect his ability to "perform work-related functions." *Id.* at 25. And the ALJ afforded "little weight" to the Agency's medical consultants' findings "because [he] afford[ed] greater weight to the claimant's and [his wife's] testimony that the claimant experienced fatigue and increasing weakness during 2011." *Id.* The ALJ spent little time discussing Claimant's treatment with Drs. Shah, Sunil, Sergeant, or Jackson, mentioning none by name and instead referring only to the results of key tests ordered by Drs. Shah (CPK tests that were "mildly

elevated" and "not concerning"), Sunil (EMG that was normal), and Sergeant (muscle biopsy that was only "mildly" abnormal and revealed no evidence of ongoing denervation). *Id.* at 24.

The ALJ determined that Claimant's conditions during the relevant time period were "more than reasonably accommodated by work at a sedentary exertion level," concluding that Claimant had the residual functional capacity (RFC):

> [T]o perform sedentary work as defined in 20 CFR 404.1567(a) except the claimant is able to stand and/or walk a total of 2 hours during an 8-hour workday; sit a total of 6 hours during an 8-hour workday; frequently operate hand controls bilaterally; frequently handle and finger objects bilaterally; never climb ladders, ropes, or scaffolds; and occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs. Additionally, the claimant can never work at unprotected heights, never work around moving mechanical parts, and never work with vibrating equipment.

*Id.* at 22, 26.

> Sedentary work is defined in the Social Security regulations as work that:
>
> involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

The ALJ determined that Claimant's RFC did not allow him to perform the full range of requirements for the sedentary exertion level of work, but concluded—based on the vocational expert's testimony—that there were significant numbers of jobs in the national economy that an individual with Claimant's limitations could perform. *Id.* at 27. Accordingly, the ALJ concluded that Claimant was not disabled. *Id.* at 28.

## Standard

Judicial review of a final decision of the Social Security Administration is generally deferential. The Social Security Act requires the court to sustain the ALJ's findings if they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court should review the entire administrative record, but must "not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the [ALJ]." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). "However, this does not mean that [the court] will simply rubber-stamp the [ALJ's] decision without a critical review of the evidence." *Id.* A decision may be reversed if the ALJ's findings "are not supported by substantial evidence or if the ALJ applied an erroneous legal standard." *Id.* In addition, the court will reverse if the ALJ does not "explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

"Although a written evaluation of each piece of evidence or testimony is not required, neither may the ALJ select and discuss only that evidence that favors his ultimate conclusion." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994); *see Scrogham v. Colvin*, 765 F.3d 685, 698 (7th Cir. 2014) ("This 'sound-bite' approach to record evaluation is an impermissible methodology for evaluating the evidence."). Additionally, the ALJ "has a duty to fully develop the record before drawing any

conclusions," *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007), and deference in review is "lessened . . . where the ALJ's findings rest on an error of fact or logic." *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014). In oft-quoted words, the Seventh Circuit has said that the ALJ "must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. When the ALJ has satisfied these requirements, the responsibility for deciding whether the claimant is disabled falls on the Social Security Administration, and, if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled," the ALJ's decision must be affirmed. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990).

## Analysis

To determine whether an individual is disabled, an ALJ must follow the five-step analysis provided by 20 C.F.R. § 404.1520(a)(4). At step one, if the ALJ determines that the claimant is "doing substantial gainful activity," then the claimant is not disabled, and no further analysis is necessary. If the claimant is not engaged in gainful activity, at step two, the ALJ must determine whether the claimant has a "severe" impairment or combination of impairments. If the ALJ finds that the claimant has such a severe impairment, and the impairment is one provided for in the Social Security regulation listings, then at step three, the ALJ must find that the claimant is disabled. If the ALJ finds that the impairment is not in the listings, then at step four, the ALJ must assess the "residual functional capacity" ("RFC") the claimant continues to possess despite the claimant's impairment. If the claimant's RFC enables the claimant to continue his or her "past relevant work," then

the ALJ must find that the claimant is not disabled. But if the claimant cannot perform past relevant work, at step five, the ALJ must determine whether the claimant "can make an adjustment to other work." If the claimant cannot make such an adjustment, then the claimant is disabled.

Here, Claimant argues that the ALJ erred at step four by: (1) failing to properly evaluate the opinion evidence and improperly reviewing and interpreting the medical evidence on his own in assessing Claimant's RFC; and (2) failing to properly evaluate Claimant's subjective allegations. Dkt. 15 at 5-15; Dkt. 21. The Court will examine each argument in turn.

## I.     The ALJ's Assessment of Opinion and Medical Evidence

Claimant's principal argument is that the ALJ erred both in failing to assign greater weight to Dr. Freeman's opinion, and in assigning "little weight" to all other opinions of record, thereby creating an "evidentiary deficit" that could not support his conclusions.

Social security regulations direct an ALJ to evaluate each medical opinion of record. 20 C.F.R. § 404.1527(c).[9] But only a treating physician's opinion may be afforded controlling weight, and then only if the opinion is both well-supported by medical findings and not inconsistent with the remainder of the record. *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011); 20 C.F.R. § 404.1527(c)(2). If an ALJ

---

[9] Amendments to the Social Security regulations regarding the evaluation of medical evidence were published on January 18, 2017. 92 FR 5844-84 (Jan. 18, 2017). Because the amendments only apply to claims filed on or after March 27, 2017, all references to the regulations in this opinion refer to the prior version.

declines to give controlling weight to a treating physician, he must offer "good reasons" for doing so, *Scott*, 647 F.3d at 739, and consider various factors to determine what weight, if any, to afford the opinion. *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008). Those factors include: (1) the length, nature, and extent of the treatment relationship; (2) the frequency of examination; (3) the physician's specialty; (4) the types of tests performed; and (5) the consistency and support for the physician's opinion. *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010); 20 C.F.R. § 404.1527(c)(2). A decision to discount a treating physician after considering these factors will stand so long as the ALJ "minimally articulate[d]" his or her reasons for doing so. *Elder*, 529 F.3d at 415 (internal quotation marks omitted).

An ALJ considering the weight to afford a non-treating physician's opinion also must examine several factors, including how well the non-treating physician supported and explained his opinion, whether the opinion is consistent with the record, whether the physician is a specialist in a relevant field, and any other relevant factor of which the ALJ is aware. 20 C.F.R. § 404.1527(c)(2).

## A.     Dr. Freeman's Opinion

Claimant argues that the ALJ should have afforded Dr. Freeman's opinion more weight because of his specialty in neurology and because he reviewed the entire record—more evidence than any other doctor—and provided a detailed report outlining his conclusions. Dkt. 15 at 5. He further contends that the ALJ failed to adequately explain both of the two reasons he gave for discounting Dr. Freeman's

opinion: that Dr. Freeman's opinion was inconsistent with the medical evidence, and the late date of his report. *Id.* at 5-6, 8.

At the outset, the Court notes that although Dr. Freeman has a specialty in neurology, he neither treated nor examined Claimant. *See* 20 C.F.R. § 404.1527(c)(1), (2) (generally, more weight given to examining versus non-examining physician, and more weight given to physicians with whom a claimant has an ongoing treating relationship). Instead, he examined Claimant's medical records on a single occasion and offered an opinion that included matters reserved to the Commissioner. Namely, whether Claimant was disabled within the meaning of the Social Security Act. *See* 20 C.F.R. § 404.1527(d)(1), (3) (the "[o]pinion that [a claimant is] disabled" is "reserved to the Commissioner," and opinions from others on whether a claimant is disabled are "give[n] [no] special significance").

But while Dr. Freeman's opinion on that issue carries no particular weight, his assessment of Claimant's functional capabilities is relevant. And despite the ALJ's conclusion to the contrary, that it was rendered after his date last insured is of no moment; Dr. Freeman analyzed Claimant's medical records from (and around) the relevant period, just as the Agency's medical consultants had. The Commissioner does not meaningfully argue otherwise.

The ALJ's decision to discount Dr. Freeman's opinion based on inconsistency was also inappropriate. The Commissioner contends that the ALJ did not merely say that Dr. Freeman's opinion was inconsistent without more. Instead, the ALJ's decision addressed the inconsistencies in two places: first, in evaluating Dr.

Freeman's conclusion that Claimant's condition met or equaled a listed impairment during the relevant time period; and second, in his discussion of Claimant's RFC. Dkt. 20 at 4-8; R. 21-22, 25.

The Court agrees that inconsistencies were discussed in two places. But those discussions were not sufficient. First, in discounting Dr. Freeman's conclusion that Claimant's myopathy met listing 11.13 or 11.17,[10] the ALJ correctly noted that to reach that conclusion:

> the record must demonstrate that, during the relevant time period, the claimant exhibited significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station. It does not.

R. 22. The ALJ pointed out that Claimant's physical examinations "were generally within normal limits," his 2013 EMG "revealed no polyneuropathy or myopathy," and his 2014 muscle biopsy was "only 'mildly' abnormal, revealing no evidence of ongoing denervation." *Id.* (citing R. 484-86, 496, 606). The ALJ concluded that the record thus did not demonstrate that Claimant "exhibited disorganization of motor function during the relevant time period" as required to meet the listing, and therefore Dr. Freeman's opinion concluding otherwise was entitled to "little, if any, weight." *Id.*

While this portion of the ALJ's analysis appears under step 3 (to which Claimant has raised no objection), the Commissioner contends that it also supports the ALJ's determinations at step 4, and that in step 4, the ALJ reviewed the medical

---

[10] The listings related to neurological disorders were amended in September 2016, but at the time of the ALJ's decision, both 11.13 and 11.17 required disorganization of motor function. *See* POMS DI 34131.03 (reflecting neurological listings at the time), *available at* https://secure.ssa.gov/poms.nsf/lnx/0434131013.

and opinion evidence, and separately concluded that Dr. Freeman's opinion did not align with Claimant's medical records. *See id.* at 23-25; Dkt. 20 at 4-8. But the problem is that rather than explain *how* the medical evidence conflicted with Dr. Freeman's RFC assessment, the ALJ merely said that it did after summarizing that evidence, and with little regard for Dr. Freeman's explanations themselves.[11] *See* R. 25 (reviewing limitations assessed by Dr. Freeman and concluding without more that "Dr. Freeman's opinion . . . is not consistent with the evidence of the claimant's functioning prior to [his date last insured].")). This is not enough. The ALJ failed to specifically address which pieces of Dr. Freeman's assessment conflict with the medical evidence (and how), and thus failed in his duty to "build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. The Commissioner's argument that the ALJ's opinion must be read "as a whole" and "using commonsense," while correct, changes neither the ALJ's duty nor the result. Dkt. 20 at 8.

The Commissioner also argues that Dr. Freeman's report is inconsistent with the medical evidence because it assessed Claimant's functionality as of 2009 and noted that Claimant's abilities have only declined since, whereas the medical records reflect an improvement in 2010, and only later reflect symptom intensification. Dkt. 20 at 5, 7. But the ALJ did not discount Dr. Freeman's opinion on this basis. *See*

---

[11] And there can be little doubt that the analysis at step 3—whether an impairment meets the definition of one of the Social Security regulation listings—differs from the analysis at step 4—a claimant's residual functional capacity, assessed only if the impairment is not provided for in the listings.

*Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) ("Our review is limited to the reasons articulated by the ALJ in her decision."); *see also Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011) ("We have made clear that what matters are the reasons articulated *by the ALJ*") (emphasis in original). Ultimately, Claimant may not prevail. But the Court will not deny him his right to a well-reasoned decision. Accordingly, remand is necessary for the ALJ to properly analyze and sufficiently explain the weight to be afforded to Dr. Freeman's opinion; the ALJ is specifically directed to more clearly articulate any inconsistencies he finds between Dr. Freeman's assessment and the other medical records, as well as his reasons for discounting Dr. Freeman's assessment over any other.

## B. The Remaining Opinion Evidence, the "Evidentiary Deficit" and the RFC Assessment

Claimant next argues that in failing to give more than "little weight" to any one medical opinion, the ALJ improperly left an "evidentiary deficit." Dkt. 15 at 5-8; Dkt. 21 at 1-4. He contends that the ALJ thus "necessarily and improperly" "interpreted the medical evidence on his own . . . into very specific work-related limitations" "without medical expert insight." Dkt. 15 at 9; Dkt. 21 at 4. In response, the Commissioner argues that the weight the ALJ assigned to each opinion was appropriate, and that the ALJ need not rely on any one opinion or choose between opinions, but rather need only assess the medical evidence as a whole in determining the RFC—a duty the Commissioner argues the ALJ discharged here. Dkt. 20 at 9.

There was no error in the ALJ's decision to assign little weight to treating physician Dr. Sweeney's opinions. The ALJ discussed Claimant's treatment and the

records reflecting his improvement following surgery and rehabilitation in 2010. *Id.* (citing R. 272, 314, 337, 342, 346, 351, 353, 357). The ALJ also reviewed the work restrictions Dr. Sweeney imposed and found them consistent with the record "at the time they were offered." *Id.* at 25 (citing R. 337, 342, 351, 353, 357). But the ALJ afforded Dr. Sweeney's opinion little weight because Claimant complained of increased fatigue, muscle weakness, and lower extremity numbness in 2011 and 2012, after his treatment with Dr. Sweeney had ended. *Id.* This was not error, and nor does Claimant complain about it. 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion.").[12]

The ALJ's decision to afford little weight to the Agency medical consultants' opinions may also have been correct. In so concluding, the ALJ noted the consultants' determinations that Claimant "could perform work at a light exertional level," but "afforded greater weight to [Claimant's] and [his wife]'s testimony that [Claimant] experienced fatigue and increasing weakness during 2011," a weighting that resulted in a less-strenuous RFC at the sedentary exertional level. R. 25-26.

But problems remain. The Commissioner is correct that the ALJ need not adopt any one opinion or choose between opinions. *Schmidt v. Astrue*, 496 F.3d 833,

---

[12] To the extent the ALJ erred in failing to specifically address more of the 20 C.F.R. § 404.1527(c)(2) factors, that error was harmless; that the ALJ afforded more weight to Claimant's more recent complaints weighed in Claimant's favor, and consideration of those factors would not change the result. *See McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) ("we will not remand a case to the ALJ for further specification where we are convinced that the ALJ will reach the same result").

845 (7th Cir. 2007). But while the ALJ stated the RFC and summarized the record evidence, he did not describe how the evidence supported each conclusion in the RFC assessment. *See* R. 22-26. This was error. *See* SSR 96-8p at *7 ("RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence"); *see also Briscoe*, 425 F.3d at 352 ("Contrary to SSR 96-8p, . . . the ALJ did not explain how he arrived at [claimant's RFC]; this omission in itself is sufficient to warrant reversal"); *Smith v. Berryhill*, 2017 WL 4150727, at *3 (N.D. Ill. Sep. 19, 2017) ("The ALJ's failure to identify specifically the evidence underpinning her RFC determination is reversible error."). By way of example, there is no discussion of what medical evidence led the ALJ to conclude that standing or walking a total of 2 hours in a workday (as opposed to a longer or shorter amount of time), or sitting for a total of 6 hours in a work-day (rather than a shorter or longer amount of time) would adequately account for Claimant's alleged pain and related limitations. Nor is there any discussion of what evidence led the ALJ to conclude that Claimant could lift 10 pounds at a time as opposed to 5 or 20, or that the ALJ need not accommodate Claimant's purported need to periodically lay down or nap because of fatigue. R. 46, 61-62. Nor was the assessment consistent with any of the functional assessments made to date. In sum, the ALJ's failure to explain how the evidence supported each conclusion means that he failed in his duty to "build an accurate and logical bridge from the evidence to his conclusion," *Clifford*, 227 F.3d at 872. And the lack of substantial evidence to support his conclusions is likewise troubling in its own right. *See Suide v. Astrue*, 371 Fed.

Appx. 684, 689-90 (7th Cir. 2010) (ALJ must rely on substantial evidence for findings, and may not fill evidentiary gap with lay opinions).

Accordingly, remand is also necessary so that the ALJ can more specifically explain the evidentiary basis for Claimant's RFC and its related functional restrictions. The Court notes, however, that it is not suggesting that the ALJ's RFC assessment is incorrect—a point on which it takes no position—but rather only that additional explanation is necessary to ensure a full and fair review of the evidence.

## II. The ALJ's Assessment of Claimant's Subjective Allegations

Claimant next argues that the ALJ's evaluation of his subjective allegations was not supported by substantial evidence. Dkt. 15 at 13-15. An ALJ is "in the best position to determine a witness's truthfulness and forthrightness." *Shideler v. Astrue*, 688 F.3d 306, 310-11 (7th Cir. 2012). Accordingly, a court should "uphold an ALJ's credibility determination if the ALJ gave specific reasons for the finding that are supported by substantial evidence," *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009), and will not disturb it unless it is "patently wrong . . . unreasonable or unsupported." *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008).

The ALJ concluded that the objective medical evidence did not support the severity of impairment Claimant asserted. R. 26. Claimant argues that in reaching that result, the ALJ "cherry-picked" only those portions of the record that supported his conclusions, pointing out that much of the evidence the ALJ relied upon arose while Claimant was still under Dr. Sweeney's care in 2009 and 2010—before his symptoms intensified. *Id.* at 13. But while the ALJ did discuss record evidence during

that period, as Claimant himself points out, the ALJ also credited Claimant's and his wife's testimony regarding increasing fatigue and weakness in 2011, using it as a basis both to discount the Agency consultants' opinions, and to formulate Claimant's RFC. Dkt. 15 at 13; R. 25, 26. And he acknowledged Claimant's continued lumbar pain, limited range of motion post-spinal surgery, and ongoing complaints of muscle weakness and diffuse joint pain. R. 26. In addition, the ALJ properly noted that Claimant's limitations "cannot be based solely upon subjective complaints and hearing testimony," and identified certain instances in which Claimant's accounts were not supported by the record. *Id.* For example, the ALJ discussed Claimant's claims of muscle weakness and diffuse joint pain, but found that the "[Claimant's] physicals were typically within normal limits, including 5/5 grip strength." *Id.* at 26, 466-95. And in discussing the December 2013 EMG, noted that it revealed no polyneuropathy or myopathy, and Claimant's subsequent muscle biopsy, noted that it revealed no ongoing denervation (while also considering that it did show some previous denervation with reinnervation). *Id.* at 26 (citing R. 484-86, 496, 606).

But while the ALJ acknowledged Claimant's testimony that his entire foot went numb in 2012, he also concluded that "the record does not document a persistently numb left foot." *Id.* at 26. The Commissioner points to multiple instances in the record demonstrating the support for this assertion, but the ALJ does not. *See* Dkt. 20 at 11-12 (citing R. 478-79 (Claimant reported neck pain but no foot issues at August 2012 appointment), R. 474-77 (Claimant complained of wrist pain but no foot issues at November 2012 appointment, and reported that he was exercising

regularly), R. 471-73 (no report of foot issues at May 2013 appointment, and Claimant again stated that he was exercising regularly)); *see also Campbell*, 627 F.3d at 306 ("Our review is limited to the reasons articulated by the ALJ in her decision."). And nor did the ALJ address all of Claimant's alleged limitations, including his purported regular need to lay down due to fatigue. R. 46, 61-62. In sum, while the ALJ need not (and did not) address every instance of increased pain or other issue Claimant experienced, he still must clearly set forth the basis for his findings. *See Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) ("An ALJ is not required to discuss every piece of evidence."); *see also Moss*, 555 F.3d at 561 (credibility determination must include "specific reasons" supported by "substantial evidence"). Therefore, remand is also appropriate so that the ALJ can provide additional explanation and support for his credibility determination.

## Conclusion

For the foregoing reasons, Claimant's motion, Dkt. 15, is granted, and the Commissioner's motion, Dkt. 19, is denied, and the case is remanded to the Social Security Administration for further proceedings consistent with this opinion.

ENTERED:

_Thomas M Durkin_

_____
Honorable Thomas M. Durkin
United States District Judge

Dated: May 23, 2019